IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:24-CR-00302-BO

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF CRIMINAL INFORMATION** |
| DAVID C. BOHMERWALD | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, pursuant to Fed. R. Crim. P 11(b)(3), submits this memorandum of law and fact to support the above-named defendant's guilty plea to the criminal information charging him with violating Title 50, United States Code, Section 4819.

Though explained in greater detail below, if the United States was to proceed to trial, it would prove beyond a reasonable doubt that the United States restricts the export of certain accelerometers to nations like the People's Republic of China because their numerous military applications define modern warfare. Accelerometers make missiles, bombs, and artillery shells "smart," guide fighter jets, drones, attack helicopters, and destroyers to their targets, orient tank turrets, and hone the explosive power of projectiles and ammunition. Whatever country has an edge in accelerometers has an advantage on the battlefield.

Despite knowing the controls imposed on these crucial items, the defendant willfully acquired 100 accelerometers from a U.S. Company (hereinafter "Company 1") on behalf of a China-based purchaser. Law enforcement thwarted the defendant

1

when he attempted to export these essential military components to China. Along the way, the defendant repeatedly lied to obtain and smuggle the accelerometers out of the United States without a license. He lied about the purchaser; he lied about the items' value; and he lied and claimed his wife and daughter were shipping the items. When federal law enforcement confronted him, the defendant admitted that he did all of this and that he did so for $10,000.00.

## RELEVANT LAWS AND REGULATIONS

1. On August 13, 2018, President Donald J. Trump signed the Export Control Reform Act ("ECRA"), 50 U.S.C. § 4801 *et seq.*, into law. A bipartisan majority in both the House of Representatives[1] and United States Senate[2] passed the law to replace the Export Administration Act of 1979 and the International Emergency Economic Powers Act of 1977 to oversee the export of dual use technology. In passing the law, Congress declared it the policy of the United States

> To use export controls only after full consideration of the impact on the economy of the United States and only to the extent necessary–(A) to restrict the export of items which would make a ***significant contribution to the military potential of any other country or combination of countries that would prove detrimental to the national security of the United States.***

In particular, Congress intends ECRA to control the release of items for use in weapons of mass destruction, use in conventional weapons, acts of terrorism, use by military programs that threaten the United State or its allies, or to disrupt or interfere with critical infrastructure.

---

[1] The House of Representatives approved of the law 359 – 54 on July 26, 2018.
[2] The U.S. Senate voted 87-10 to pass the law on August 1, 2018.

2. Congress granted the President the authority, through ECRA, to control the export, reexport, and in-country transfer of items. ECRA further grants to the Secretary of Commerce the authority to establish the applicable regulatory framework. Pursuant to ECRA, the United States Department of Commerce reviews and controls the export of certain items from the United States to foreign destinations through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774. In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be exported lawfully from the United States or reexported from one foreign destination to another.

3. Pursuant to the EAR, the Department of Commerce may impose licensing requirements for specific exports, reexports, or in-country transfers of any item upon determining an unacceptable risk of use in or diversion to a military end use. *Id.* § 744.21(b). The Department of Commerce has determined that exports and reexports of items to the People's Republic of China run an unacceptable risk that they may be diverted to use by the People Liberation Army, the military branch of the Chinese Community Party.

4. The Bureau of Industry Security (BIS) within the Department of Commerce is the principal agency devoted to the development, implementation, and enforcement of export controls for commercial and military technology. Within BIS, the Office of Export Enforcement (BIS-OEE) protects U.S. national security, foreign

3

policy, and economic interests by investigating violations, prosecuting violators, educating industry on export standards, and interdicting illegal exports. To accomplish this task, BIS-OEE employs over 150 special agents worldwide. BIS-OEE special agents are sworn Federal law enforcement officers with the authority to make arrests, execute search warrants, serve subpoenas, and detain and seize illegally exported items.

## ACCELEROMETERS

5. Accelerometers are electronic sensors that measure an object's change in velocity over time. The sensors detect multiple measures of acceleration including the acceleration caused by gravity (tilt), the internal movement of the object caused by the change in velocity (vibration), and how hitting another item affects the object's acceleration (impact).

6. Accelerometers have numerous applications in both the development and performance of everyday items. The airbags in a car deploy because an accelerometer detects the sudden impact and deceleration caused by a car crash. Manufacturing plants use accelerometers to determine if the manufacturing process is stressing their machinery to the breaking point. Every smartphone contains an accelerometer; it tells the device when a person has rotated the phone and the orientation of the screen should change. In earthquake prone areas, accelerometers help measure seismic activity. Accelerometers also play a significant role in both the robotics and aviation industries. As of 2024, the market for accelerometers was roughly about $3.16 billion and is expected to grow to roughly $6.5 billion in 2035

4

largely due to increased automation and their incorporation into wearable technology like smart watches. In the modern world, accelerometers are everywhere and only becoming more ubiquitous.

7. On the battlefield, accelerometers have numerous military specific applications. Accelerometers are critical to the design, development, and deployment of munitions. Precision munitions, colloquially known as "smart bombs," exist because of the advanced internal guidance systems enabled by accelerometers. A munition's payload is not getting to the target, whether in a missile or a bomb, without an accelerometer having measured the shock and vibration of the delivery vehicle and the explosive power of the actual warhead. For example, by measuring their vibration, accelerometers ensure missiles fly straighter and without breaking apart before they hit the target. Beyond munitions, military engineers and researchers employ accelerometers to test structures resistance to impacts, to improve flight control systems for fighter jets, helicopters, and drones, and to make sure soldiers have effective navigation systems. Tank fire control systems and the guns on naval ships depend on accelerometers to function in rough terrain and seas in the harshest environment. When U.S. Soldiers, Marines, Sailors, and Airmen go into the fight, they do so with weapons and systems honed and perfected by accelerometers.

8. While they are ubiquitous, military applications require higher performing accelerometers. Military applications often use Micro-Electronic-Mechanical Systems ("MEMS") accelerometers, a specific type of accelerometer,

5

Case 5:24-cr-00302-BO    Document 14    Filed 02/14/25    Page 5 of 17

because they are highly accurate and more sensitive while also having a minimal temperature drift and low power consumption. MEMS accelerometers also provide real-time data where older accelerometers record the data for later access. United States companies, including Company 1, produce coveted MEMS accelerometers.

9. One of Company 1's products is a low-cost, general purpose MEMS accelerometer that can be used in instrumentation, robotics, seismic measurement, tilt measurement, vibration measurement, original equipment manufacturing, and vehicular applications. They are relatively insensitive to temperature changes and gradients and are highly stable and durable.

10. Export of Company 1's accelerometers are controlled under the ECRA and the EAR. The products are regulated as EAR99 items. While EAR99 products like the accelerometers do not normally require a license for exportation, a license is required to export to embargoed countries such as Iran and North Korea. A license is also required for export to prohibited end-uses, such as for use in ballistic missiles in certain countries or by parties listed on the BIS Entity List. Pursuant to Title 15 of the Code of Federal Regulations, Section 744.21 ("Restrictions on certain 'military end use' or 'military end user' in Burma, The People's Republic of China, The Russian Federation, or Venezuela") in June 2018, the Deputy Assistant Secretary of Commerce for Export Administration established a requirement that exporters of these accelerometers obtain an export license in certain circumstances. Initially, the requirement applied only to some exports to specific parties in China, but the

6

requirement was subsequently amended in December 2018 to cover all exports to China and Hong Kong.

11. In 2019, the Department of Commerce sent a letter to Company 1 informing them that certain models of their accelerometers, including the one at issue in this case, required a license for specific export, reexport, or in-country transfer to China. The letter justified the new requirement because of the "unacceptable risk of use in or diversion to 'military end use" activities in China." Accordingly, the is-informed letter required Company 1 to obtain a license prior to exporting an accelerometer to Hong Kong or China, or to any customer if they knew the ultimate destination of the accelerometers was Hong Kong or China.

12. The is-informed letter is only one part of the United States Government's on-going, whole of government efforts to keep advanced accelerometers out of the hands of the People Liberation's Army and other nefarious actors' hands. In 2016, a federal jury in the Western District of Washington convicted a Fijian-citizen for attempting to covertly acquire accelerometers on behalf of a Chinese end-user. In July 2024, the United States Department of Treasury sanctioned multiple companies in the People's Republic of China and Hong Kong for serving as front companies to funnel accelerometers to Iran's Ministry of Defense and Armed Forces Logistics. In that case, the accelerometers were intended for Iran's ballistic missile and unmanned aerial vehicle (UAV) programs. In September 2024, the Department of Commerce placed a Belgian individual and his company on the entity list for trying to secretly funnel accelerometers to the China Aerospace Research Institute ("CARI"),

7

a likely subsidiary of the China Aerospace Science and Technology Corporation ("CASC"). CASC is a state-owned entity that serves as a primary contractor for China's space program.

## COMPONENTS COOPER

13. Components Cooper is a North Carolina-based company that has existed since May 2018 which lists its business as electronic sales. It is a reseller and sourcing agent for other companies. According to state records, Components Cooper's principal office and mailing address was the same as the defendant's then home address. The defendant was Components Cooper's Owner, President, and sole employee.

14. Review of export records indicates Components Cooper has been associated with at least twenty-six exports. Those exports have gone to locations in Canada, Switzerland, the United Kingdom, Hong Kong, and the People's Republic of China. Of the total exports, two went to Hong Kong, while nine went to two companies (Han Hong E-Trade Co Ltd and HK DK International Electronics LTD) in China. All those exports were purported to be either integrated circuits or electronic components. Five of the exports occurred in 2022 or 2023; all five exports went to Shenzhen, China.

## THE DEFENDANT ACQUIRES CONTROLLED ACCELEROMETERS ON BEHALF OF A CHINESE COMPANY

15. In June 2023, the defendant reached out to Company 1 for a quote for Accelerometers controlled under the is-informed letter. The defendant sent the following email:

8

> **From:** Chris <sales@coopercomp.com>
> **Sent:** Friday, June 16, 2023 8:10 AM
> **To:** 'Jason ▮
> **Subject:** RE: Quote for 1521L
>
> I need 100 pcs !!! Thanks in advance
>
> **David C Bohmerwald**
> President
> Sales | Components Cooper
>
> ---
>
> ■ 919-689-8333 | 516-343-3336
> ■ sales@coopercomp.com
> ■ 2620 Peachleaf Street, Raleigh, NC, 27614

16. Before quoting the defendant a price, Company 1 sent the following email:

> **From:** Kati ▮
> **Sent:** Friday, June 16, 2023 5:55 PM
> **To:** 'Chris' <sales@coopercomp.com>
> **Subject:** RE: Quote for 1521L
>
> Great. Since we don't have an official relationship, we do require end user and application information to comply with Entity List screening before we provide a quote. I've attached the form. The information is only used for screening purposes and not shared with any other company. Once you return that, I'll send a quote right over.
>
> Best regards,
> Kati
>
> Kati ▮                    Director
> ▮

9

17. Attached to that email was a document entitled "Resale End User Statement & Declaration" ("Declaration"). On June 20, 2023, the defendant returned the completed Declaration to Company 1. It set out that:

> Silicon Designs requires this screening information to meet the US Government's requirements for "knowing your customer."
> This information will not be used or shared for commercial purposes.
>
> **Purchaser's Information**
> Company: Components Cooper
> Tax ID or VAT #: 82-5245515
> Address Line 1: [redacted]
> Address Line 2:
> City, State, Country: Raleigh, NC 27614
> Phone:
> Website:
> Contact Person: David Bohmerwald
> Contact Email: Sales@coopercomp.com
> Description of Business: Distributor
>
> **End User Information (if different than Purchaser)**
> Company: [redacted]
> Tax ID or VAT #:
> Address Line 1: [redacted]
> Address Line 2:
> City, State, Country: [redacted] MO [redacted]
> Phone:
> Website: [redacted]
> Contact Person: [redacted]
> Contact Email: [redacted]
> Description of Business: US Battery Manufacturer | Leading Battery Technology Company [redacted]

18. Company 2, the purported end user, is based in Missouri and produces batteries and energetic devices that support the defense, space, and aviation industries. In that End User Declaration, the defendant also represented that Company 2 would use the accelerometers in a manufacturing, testing, or measurement process. Specifically, he identified the intended application for the accelerometers as "robotic automation." The defendant signed the Declaration on June 20, 2023. To the right of his signature was the following notice:

10

> We certify that all of the facts contained in this statement are true and correct to the best of our knowledge and we do not know of any additional facts which are inconsistent with the above statements. We shall promptly send a supplemental statement to ▓▓▓ disclosing any change of facts or intentions set forth in this statement which occurs after this statement has been prepared and forwarded. We will not reexport, resell, or otherwise dispose of any items related to this statement (1) to any country not approved for export as brought to our attention by means of a bill of lading, commercial invoice, or any other means, (2) to any person if we know that it will result directly or indirectly, in disposition of the items contrary to the representations made in this statement or contrary to US Export Administration Regulations.

19. Through an existing relationship with the Bureau of Industry Security (BIS), Company 1 informed law enforcement of the defendant's request for 100 accelerometers. Company 1 reached out to law enforcement because 100 was a large order, especially for an initial design.

20. Special Agents with BIS-OEE and the Naval Criminal Investigative Service (NCIS) contacted Company 2. Company 2 indicated it had previously done business with defendant and Components Cooper. At the time of the defendant's request for a quote from Company 1, though, Company 2 did not have any pending orders with defendant. Company 2 did not have an order for the specific accelerometers for which defendant requested a quote.

21. Before giving him a quote, Company 1 again informed defendant that "[t]he department of commerce has asked us to be particularly vigilant about where our 1521L-050 parts go." Company 1 asked defendant to confirm when Company 2 had placed its order with Components Cooper. He ignored Company 1's request.

11

Eventually, Company 1 provided a quote of $185.00 for each Accelerometer with a total price of $18,500.00.

22. On July 17, 2023, defendant informed Company 1 that he was going to buy at that price. Defendant specifically told Company 1 he was "going to send a check for 18500. For PO# 7495" and that it would take roughly a week to reach Company 1.

23. Company 1 responded with a pro forma invoice. That pro forma invoice has a purchase order number of 7495. Under the total price is this statement:

> Export Control Statement: Some of ▮▮▮ products are restricted by the US Department of Commerce, BIS, and an export license is required for export/re-export to certain countries or for specific military and/or defense applications. ▮▮▮ products, and the direct product of the technology, may not be exported directly or indirectly, or re-exported to any destination within a country listed in country group D:1, E:1, or E:2, as listed in supplement #1 to part 740 of the CCL.

> Direct Wire Transfers:
> ▮▮▮
> SWIFT Transactions:
> ▮▮▮

> NOTE: Lead times are estimates and subject to change. All prices are FOB ▮▮▮ USA, and shipping charges will be added unless otherwise specified. Duties and local taxes are the responsibility of the recipient.

24. The pro forma invoice was attached to an email that read:

> It occurred to me you might want a pro forma invoice to go with your prepayment records. Please read it over and make sure I didn't miss anything and everything looks correct. I have to include the export statement because the [accelerometers] are in demand by a few countries like China, Russia, etc. which would require an export license for them. I highly recommend you double check with your customer to make sure they won't be sending them to any country in those groups for your own records of due diligence.

Later that day, defendant responded to email and the attached pro forma invoice. He wrote "I have done all my due diligence…I sent you all the information to the best of my knowledge as to who what a were these are going."

25. That was a lie. The defendant knew he was purchasing the items for a Chinese national who ran a technology company based in and around Hong Kong, China. He had received $28,500.00 from the Chinese national and intended to send them once he had acquired them from Company 1.

26. On July 24, 2023, Company 1 received a check from the defendant for $18,5000 in the mail. The check identified Components Cooper, Inc. as the payer and the payer's address as the defendant's home address. Crucially, the check's memo item had "PO# 7495," a reference to the purchase order listed in the pro forma invoice.

27. Company 1 shipped the 100 Accelerometers to the defendant on August 11, 2023, using FedEx Express. As part of that shipment, they included invoice # i24-1105. It was for potential order # 7495. It is addressed to Components Cooper and lists Components Cooper as the shipping location. After identifying the serial numbers of the accelerometers and their price, the invoice contains similar information related to export controls on the items. It says

> Some of ▮▮▮ products are restricted by the US Department of Commerce, BIS, for export/re-export to certain countries or for specific military and/or defense applications. If you intend to export/re-export to a different country than is listed in the SHIP TO field above or for use in military/defense purposes, please contact ▮▮▮ for additional information.
>
> **Order Notes**　　　　　**Q Notes & Clauses**
>
> Export Control Statement: Some of ▮▮▮ products are restricted by the US Department of Commerce, BIS, and an export license is required for export/re-export to certain countries or for specific military and/or defense applications. ▮▮▮ products, and the direct product of the technology, may not be exported directly or indirectly, or re-exported to any destination within a country listed in country group D:1, E:1, or E:2, as listed in supplement #1 to part 740 of the CCL.

28. On August 15, 2024, defendant received the parcel containing the 100 accelerometers at his home address. Also, the Department of Commerce made an official license determination that the Company 1 accelerometers required a license to be shipped to Hong Kong and China.

13

29. Law enforcement observed defendant drop two parcels at a local FedEx shipping store on August 16, 2023, Special Agents with the Federal Bureau of Investigation (FBI) and BIS learned from store workers that one of the parcels was being sent to a Chinese Company in Hong Kong, China. That package listed the exporter as "Chris, Components Cooper, [defendant's home address]." Chris Koronkiewicz is the defendant's wife. The commercial invoice and shipment documentation declared that parcel's value at $100. There was no Electronic Export Information ("EEI") filing, as required by law, submitted with that package. Similarly, there was no export license declared for the shipment to Hong Kong. Additionally, the defendant signed using his minor daughter's signature. The use of someone else's name to send the item, a different individual signature, the undervaluing of the product, and the lack of an EEI are all indicators of an illicit technology export.

30. The Special Agent with BIS detained and inspected the package intended for Hong Kong. He found the 100 Company 1 accelerometers in the package and identified them by their serial numbers. Following the attempted export, the BIS Agent searched relevant databases and did not find any licenses approved for Components Cooper or any entity located at the defendant's home address.

31. After the inspection, FedEx updated its online package tracking system, indicating it had been seized by law enforcement. The defendant subsequently went to the local FedEx store to inquire about what happened to the shipment. When informed it had been seized and to reach out to FedEx security about the package,

14

the defendant emailed FedEx security to ask how to get the package released for shipping to Hong Kong, China.

32. BIS and FBI agents interviewed defendant at his home on August 18, 2023, before executing a premises search warrant. During that conversation, the defendant admitted to acquiring the accelerometers on behalf of a Chinese-based company. Specifically, the defendant acknowledge that he was the middleman for a Chinese National with whom he communicated with over email and other messaging platforms. The Chinese national had solicited the defendant to acquire the accelerometers and ship them to China.

33. The defendant acknowledged that the accelerometers were export-controlled and required a license. He further admitted to misrepresenting the end-user to Company 1 to acquire the items. The defendant explained that he removed the labels from the accelerometers and deliberately undervalued the shipment to avoid scrutiny by customs. He also told the agents that he had signed the package with his daughter's signature and used his wife's name to ship it. Finally, defendant told the agents he had deleted incriminating communications between himself and the Chinese national.

34. According to defendant, this was not his first instance of working with the Chinese national. He claimed to have done this previously in 2020 and sent 20 Accelerometers to China through another export company based in the United States.

35. Records maintained by U.S Company 1 confirm that in 2021 the defendant purchased 20 accelerometers valued at $3,980. Before selling the items,

U.S. Company 1 told the defendant that the items were dual use and used in several defense programs in both the United States and North Atlantic Treaty Organization (NATO). In that instance, the defendant also falsely provided a domestic end-user, this one in New Hampshire, within the United States to circumvent export compliance requirements. The defendant then shipped those items to the same Chinese-based customers.

## CONCLUSION

36. Based on the foregoing, there is ample information that the defendant, David C. Bohmerwald, did on or about August 16, 2023, in the Eastern District of North Carolina, knowingly and willfully export and cause to be exported, or attempt to export, U.S. Company 1 accelerometers from the United States to China without first having obtained the required authorization or license from the Department of Commerce, in violation of Title 50, United States Code Section 4819 and Title 15 Code of Federal Regulations Sections 744.21(b) and 764.2.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

37. Therefore, the United States respectfully requests this Court accept the Defendant guilty plea to the criminal information and enter judgment.

Respectfully submitted, this the 14th day of February 2025.

DANIEL P. BUBUAR
Acting United States Attorney

BY: *Logan W. Liles*
LOGAN W. LILES
Assistant United States Attorney
Criminal Division
150 Fayetteville St., Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4045
Facsimile: (919) 856-4828
E-mail: Logan.Liles@usdoj.gov
N.C. State Bar No. 47888